### MEXICAN CENT. RY. CO., Limited, v. TOWNSEND.

(Circuit Court of Appeals, Fifth Circuit. April 22, 1902.)

#### No. 1,117.

INJURY OF BRAKEMAN—NEGLIGENCE—DEFECTIVE CAR—DIRECTION OF VERDICT.
  Where, in an action by a brakeman to recover for injuries resulting from a fall from the top of a car, caused by the breaking of a running board, the evidence was conflicting as to whether the board was rotten or sound, and it appeared that the brace which supported the end of the board was loose, and hanging down, after the accident, but the evidence did not conclusively show that it was in that condition when the car was last inspected, or when it should have been inspected, it was error to direct a verdict for plaintiff, as the question of defendant's negligence should have been left to the jury.

114 F.—47

In Error to the Circuit Court of the United States for the Western District of Texas.

The plaintiff (defendant in error here) was employed as a brakeman by the defendant (plaintiff in error). On the 9th or 10th of February, 1901, while so engaged in the service of the defendant company, the plaintiff, in the performance of his duties, was required to be on top of the defendant's train, and to go from one car to another. The running board on one of the cars on which the plaintiff was walking suddenly broke and gave way, and the plaintiff was thrown from the top of the car to the ground, and as he fell his left hand, arm, and wrist were caught under the wheels of the cars, and so mangled and bruised that it became necessary to amputate his hand about the wrist. D. S. McCurdy, a witness for the plaintiff, describes the condition of the car as he found it immediately after the accident: "We found the running board on one of the cars with about five or six feet broken off. Only one of the planks was broken. We examined this plank, and found it was dry rot and cross-grain board. We also found that the brace was not attached to the end of the car and the end of the running board, but was hanging downward, and pushed to one side towards the right. The running board is composed of three pieces of plank nailed on the top of the car, and projects over the ends of the car. All of these pieces of plank compose the running board, and extend over the end of the car about eight inches. These boards are nailed on top of the car, and have a brace underneath the ends of the running board, which is fastened with a bracket to the side of the car and the projecting ends of the running board. When we examined this brace, we found it hanging downward to the right. This brace was detached from the end of the car and the end of the running board. We examined the end of the running board that was broken. It was broken or split off with the grain of the board for about six inches. I also examined the running board to see whether it was nailed or not. I only examined it at the rear end. This end was nailed. The rear end was nailed. That would be about the center of the car. We also examined the drawheads between these two cars, and found the drawheads all right. * * * The car was No. 1,423. * * * The running board was broken off, and was dry rot, wind-shaken, or dry rot cross-grain. I mean by 'wind-shaken' the same as dry rot. I cannot explain dry rot except that it is dry rot. This was a dry-rot board and also cross-grain. The grain went across the board instead of straight. The plank did not have a hole rotted through it, but was just wind-shaken all through. It was dry rot all of the way through. You can see by looking at the end of the board. I found a dry rot through the end of the board that was left. The bracket was hanging down about six inches. and pushed to the right, and was loose on one end. The bracket was not on top of the car, but was on the end. It was loose from the end where the brace had come loose. There was nothing the matter with it except it was loose. I cannot tell exactly how many minutes it was after the accident until we examined this car. It was just as quick as we could get plaintiff into the caboose, and I could notify the engineer and fireman, when we made this examination." The condition of the car after the accident as described by this witness is confirmed by the evidence of Herman Baker and the plaintiff. Baker said: "I made a very careful examination of this piece of plank, because I wanted to see what caused it to break. The piece that was broken off was between four and six feet long, and at the place where it was broken it was somewhat decayed and rotten, and also seemed to be very old, and the end was freshly broken. I also looked at the top of the car, and saw where this piece of plank had been broken off. I think the running board was made of two or three boards laid together, but only one of the boards on the outside was broken. I think the car on which this board was broken was C. M. No. 1,423." Plaintiff, testifying himself, described the particulars of the accident and the condition of the car as he found it after the accident, and also testified to facts tending to show his suffering, the extent of his injuries, and the extent of his damages. C. E. Meyer, a witness for the defendant, testified as follows: "My business is car inspector for the Mexican Central at Torreon. I am

acquainted with car No. 1,423, Mexican Central. It is a beer car. I do not know anything about when the car was overhauled. There is that board (pointing to the board on floor) that has been on it. I had something to do with the taking of that board from the car. That board came off of the left side of the car. There was no more of the board of the left-hand side of the running board than that. There are two lengths of boarding on the car. There are three boards on the car of that size. This is the one on the outside. That is the full length of it. I sawed that board in two. Complete, it would measure sixteen feet. The board is about eight foot six inches long. There is about seven feet six inches gone. I got that board about a month or five weeks ago. The car was at Torreon at that time, in cold storage, to be overhauled. (Witness examined board.) This board is not rotten. This is where it was turned up, so as to be exposed to the weather (indicating). This is the bottom. That is put on cleats. This part (indicating upper part) is turned towards the sun. There were three boards there when I took this off. The cleats of this board are just about two feet apart. Cleats are the pieces where the nails go. They were still there, and in good condition. Three boards still remained on the car. A board is five inches wide. Five inches width of board was still there when I took this off." Cross-examination: "I saw this car No. 1,423, just as I said, five or six weeks ago. It was about the 24th of July when I took that board off. I didn't see the car from the time of the accident until I took this board off, and didn't pay any attention to it. I took this board off at Torreon. It was taken back there. I believe that the company permitted this broken running board to be on the car from the 10th day of February until the 24th day of July, 1901. If Mr. McCurdy, the conductor, and Mr. Townsend, the brakeman, say that there were three running boards on there, they are mistaken. I do not claim to know this was the car Townsend was hurt on. I do know whether I took that board from the car on which Townsend was hurt on or not. Mr. Cox told me to take it off. I do not know what position he occupies with the Mexican Central. I know that he is an official of that road. I cannot say exactly just what official he is. I do not know just exactly whether I had any orders to obey his request in taking that off or not. He came and asked me to take it off, and I took it off. Had you (to Patterson) asked me to take it off, I would have done so. I do not know who you are. This was a beer car, white painted on the sides, and the ends and roof were red. The running board was of the color red. I mean by 'cleats' the cleats under the running board. I mean the cleats were pieces that ran across the car, and this rested on it. The nails hold up the balance, but I took them off. The balance of the nail holes are the same now as when I took it off the car. The cleat was in the bottom, and these boards were then just like I took them off the cleat. (The boards are shown to the jury.) I have been in the railway service since 1881. I have had considerable experience with cars. It is the only thing I have had to do since that time. About seven and a half feet were gone from this. It extended over the end of the car six inches. If there was a high car, and a man would jump down on it, it might split. A couple of jumps might crack it, and it might open a little. A brace under the end would have a good  • effect. It would have a good effect for a man to jump here as on there (indicating with reference to table). If a cleat had been there, and a man stepped on it there, it would have been solid. It could not have been broken there. The effect the nails would have on the solidity of the board would be its strengthening. It might not be broken if it was properly nailed down. Stepping on the end wouldn't break it. If I tried to make a pretty good jump, it might strike it, and break it. If I were over on this car, and jumped over, it would not break it. Jumping there (indicating) might break it. If the brace were off, it would not interfere much with the board; at the same time, it might break the board." Redirect examination: "The last cleat is about two inches from the end. There is four feet between the bracket and the end of the car. There are four feet between these brackets." Recross: "I am car inspector. On the Mexican Central it is the duty of the car inspector to inspect the box cars. Q. If this running board came over six inches— Had this been taken out on top, and this cleat braced under

it, could a Mexican Central car inspector have seen it? A. Yes, sir. He is there to look at it. That car laid up there about two weeks or ten days. If I didn't find anything the matter with the car, I made no record of it. I did not inspect it from the day. before the accident until the 24th of July. That is something I did not do. I did not say the 24th day of July was the day upon which I first saw it. I said I took the board off on that day. I had inspected it before. Those beer cars came there every ten days or two weeks. I have been inspecting this car on and off for the last year. I could not say how many times I inspected it from the 9th of February until I took this off. I inspected that car between the day of accident and 24th of July, and reported it in good order. There are a whole lot of these cars. Anything is safe to run when there is no danger of getting hurt. Anything unsafe to run we report. I considered that running board just as safe as if a new running board was on there, when I took it off. Between February and the time I inspected it, I saw this running board, but didn't notice it before. The chances are I noticed it, and did not. Had I noticed it, I would have considered it safe to run. I didn't see it from the time of the accident until I took it off. The chances are I might have looked over it. If there are two side tracks, I go on one train and look at other. If there was a cleat, and that was the end of the car, or the end of the board, and this was two or three inches higher than the car (indicating), and it was even, I would consider it safe. The end would be about two inches higher than top of the car. The inside would not be quite so much. Saying this (indicating) is the top of the car, this (indicating) would. be two inches higher than the top of the car. That is considered as good pine. Now, if a man jumped from one car to the other, although braced, it would crack. It would break at the rotten or weak place, if properly nailed down. So far as I could see, the board was well nailed. Some inspector might have taken the nails out. I might have taken them out myself. A nail sticking out as this was would be safe. It would be safe two inches above the top of the board. The whole board is about two inches higher than the top of the car. I have been caught lots of times. I either drive them down or pull them out. You will find that the widths of most of the running boards are from 12 to 14 and 16, and 18 and 20, some of them. A good many are not wider than 12. When the strips remained, the running board at that place was fifteen inches." The court instructed the jury to find a verdict for the plaintiff for such damages as he sustained by reason of the injuries which he suffered, to which charge the defendant duly excepted. The jury found a verdict for the plaintiff for $13,800, and a judgment was thereon rendered.

T. A. Falvey and Waters Davis, for plaintiff in error.

Geo. E. Wallace, for defendant in error.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

SHELBY, Circuit Judge, after stating the facts, delivered the opinion of the court.

In determining the question whether it was proper to give peremptory instructions in favor of the plaintiff, we must look at the case as it appears from that part of the evidence which is most favorable to the defendant; for we must concede to the defendant anything which it could fairly claim from the evidence. It had the right to ask the jury to believe the evidence that was favorable to it. When a party asks for peremptory instructions in his favor, he must concede all that his opponent may fairly claim from the evidence presented. When a passenger sues the carrier, proof of an accident carries with it a presumption of negligence on the part of the carrier. But a different rule prevails in a suit by an employé against the employer. The accident in the latter case carries with it no such

presumption. The employé is required to prove the negligence of the employer. Patton v. Railway Co., 179 U. S. 658, 663, 21 Sup. Ct. 275, 45 L. Ed. 361. The evidence unquestionably shows that immediately after the accident the brace that was intended to support the end of the running board was down. The evidence on the part of the plaintiff also shows that the board which was broken was wind-shaken, cross-grained, and rotten. The evidence on the part of the defendant tended to show that the board broken was sound. There is no conflict, however, in the evidence that the brace or support at the end of the board was loose, and hanging down, when the car was examined after the accident. It appears to us that from the condition of the car either one of two conflicting inferences might have been drawn: The jury might infer that the brace became loose and came down since the last inspection of the car, and at or about the time of the accident; or they might infer that it was for some time—probably a few days—in this condition, with the brace misplaced as described by the witnesses who saw it immediately after the accident. If it was in such condition at the time when the car was or should have been inspected, it would clearly have been negligence in the inspector not to discover and report the defect. On the other hand, other inferences might be made if the car was inspected the day before or shortly before the accident, and the brace was in place, and the part of the running board which broke was sound, and sufficient for the purposes for which it was used; or, if unsound and weather-shaken, it was covered with paint, and the defect hidden, so that it was not perceptible or discoverable by proper inspection. From the fact that the brace was hanging down and misplaced when the accident occurred, the jury might infer that it was in that condition at the time when an inspection was or should have been made. But this inference seems to us, from the facts, not compulsory. A contrary inference is not irrational. The evidence tends to show that an inspection was made before the accident,— probably the day before the accident. Although the witness was examined, cross-examined, and re-examined, he is not asked in what condition he found the car. He does say though, in reference to a later inspection, "Anything unsafe to run we report;" and, as we understand the evidence, this car was not reported. A piece of board was in evidence before the jury. The evidence of the witness producing it tended to show that it was a part of the board which had been broken at the time of the accident; not the part broken off, but the part left on the car at that time. The witness producing it testified that it was sound; that it was not wind-shaken or rotten. If unsound, whether it was so painted as to cover the defects from sight or inspection is left uncertain. It appears, however, to have been painted, but it is left to inference whether it was in such condition that on the day before the accident a proper inspection would have discovered the defects in it, conceding it had defects. It might have been inferred that the defect was perceptible and long-existing; but, to sustain the instruction given the jury, that alone is not sufficient. It must also appear that no other inference was reasonable; that is, to sustain the instructions given, the evidence must be such

that no other inference but that of negligence of the defendant could be reasonably drawn from the facts in evidence. The evidence altogether, as presented in the bill of exceptions, is amply sufficient to authorize a jury to make such inferences as would justify a verdict for the plaintiff, yet we are constrained to say that it is not such as to justify us in saying as matter of law that no reasonable inference could be drawn from it except that of the negligence of the defendant. The evidence in the record tends strongly to sustain the inferences drawn from it by the learned trial judge, but we cannot hold that the jury could have made no rational inference to the contrary, and we are therefore constrained to decide that the case, on proper instructions, should have been submitted to the jury.

The judgment of the circuit court is reversed, and the cause remanded for a new trial.