## ILLINOIS CENT. R. CO. v. WARREN.

(Circuit Court of Appeals, Fifth Circuit. December 31, 1906.)

No. 1,533.

1. CARRIERS—PASSENGERS—ANNOUNCEMENT OF STATION—INVITATION TO ALIGHT.

The announcement of the next station by a porter on a railway passenger train, though made on the near approach to the station, is not an invitation to a passenger to leave his seat and attempt to alight before the train actually stops.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 9, Carriers, § 1224.]

2. SAME—POSITION IN TRAIN—CONTRIBUTORY NEGLIGENCE.

Plaintiff and his brother-in-law were riding on a railroad train, guarding a negro. On the announcement of the station where they intended to alight, plaintiff, for the purpose of resuming custody of the negro and of getting off quickly, left his seat in the smoking compartment while the train was in motion, and went forward through the colored compartment to the front door of the car, which he opened, and stood there waiting for the train to slow down, with his right foot on the door sill, his left foot on the platform, and his right hand on the door facing, from which position he was knocked or pushed by the train porter, so that he fell from the car while the train was in rapid motion, and was injured. *Held*, that plaintiff was guilty of contributory negligence in taking the position he did, and was not entitled to recover, in the absence of proof that the action of the train porter was willful.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 9, Carriers, §§ 1375, 1376.]

3. SAME—WILLFULNESS.

In an action for injuries to a passenger by being pushed from a car platform by the car porter while the train was in rapid motion, evidence *held* insufficient to warrant a finding that the porter's act was willful or other than accidental or negligent.

4. EXCEPTIONS, BILL OF—CONSTRUCTION.

Where, in an action for injuries to a passenger, defendant claimed that certain acts occurring at the trial with reference to the extent of plaintiff's injuries unduly influenced the sympathies of the jury, and applied for a new trial on that ground, but the trial judge in denying a new trial did not specifically find that undue influence and prejudice had in fact occurred, the bill of exceptions on a writ of error should be construed to

mean that, while the facts were as stated, the jury were not unduly influenced thereby.

Shelby, C. J., dissenting.

In Error to the Circuit Court of the United States for the Northern District of Mississippi.

This is a suit brought originally by James Warren against the Illinois Central Railroad Company to recover damages for personal injuries received under the following circumstances, as detailed by himself on the witness stand:

"Q. Is this James Warren?

"A. Yes, sir.

"Q. Now, you speak to the jury over here, these gentlemen sitting in that box. Where do you live, Mr. Warren?

"A. I live in Pontoc county, close to Thaxton, a mile the other side of Thaxton; what they call 'Butter Milk Springs.'

"Q. Are you the plaintiff in this case against the railroad company?

"A. Yes, sir.

"Q. Just tell these gentlemen here how you came to bring this suit, and what caused this. Did you have anybody in your employ? If so, who?

"A. Yes, sir; I had a nigger, Andy McGlon.

"Q. Where were you living when you had him in your employ?

"A. A mile and a half the other side of Thaxton; the other side of Cain Creek.

"Q. How old are you, Mr. Warren?

"A. Thirty-two years old, going on 33.

"Q. When were you hurt by the railroad company?

"A. Last February, a year ago.

"Q. What was your occupation at the time you were hurt?

"A. Farming.

"Q. Have you any family?

"A. Yes, sir.

"Q. What?

"A. My wife and two children.

"Q. The little fellows here?

"A. Yes, sir.

"Q. Where did you go that day?

"A. Taylor's depot.

"Q. What did you go for?

"A. I went after Andy McGlon, that nigger.

"Q. Now, you went there after Andy. Do you know what day of the week that was?

"A. Tuesday.

"Q. Well when you got down there, Mr. Warren, what did you do at Taylor? Did you get him or not?

"A. Yes, sir.

"Q. Anybody with you?

"A. Yes, sir.

"Q. Who?

"A. J. H. Kelly.

"Q. Is he here now?

"A. Yes, sir.

"Q. Well, did he come or not with you from Taylor's?

"A. Yes, sir.

"Q. Now, when you were coming north on the train from there—Taylor's is south of here, is it not?

"A. Yes, sir.

"Q. You came from Taylor's here. Who came with you on that trip?

"A. Me and Andy McGlon and J. H. Kelly.

"Q. What occurred, if anything, when you were nearing the station of Oxford? Tell the jury now about that in your own way.

"A. Well, the porter came running through the train hollowing 'Oxford! Oxford!'

"Q. What porter?

"A. The nigger porter.

"Q. Porter of what? Train porter, or what?

"A. Yes, sir; the train porter.

"Q. Go on, now. He came through hollowing 'Oxford! Oxford!'

"A. Yes, sir; and I set there a while and got up and walked in through that box into the other one—

"Q. You say box—what do you mean by 'box'?

"A. Well, car; box car.

"Q. Were you in the smoking compartment, or negro coach, or ladies' coach, or where?

"A. I was in one part of the smoker. There is a partition in the car there.

"Q. You were in which one?

"A. I was in the back part of it, and I got up and went in where the nigger was, in the coach where the niggers were; and I told him to get up, that we were at Oxford now, and I was fixing to get off, and I walked to the door, and the nigger gets up and follows me.

"Q. Where was Kelly?

"A. Just behind the nigger.

"Q. How close was he there?

"A. He was right there behind the nigger, and the nigger was right at me.

"Q. Did you see them?

"A. Yes, sir.

"Q. Now, when you got to that door, was that the front end or the back end of that car?

"A. The front end.

"Q. Of the car?

"A. Yes, sir.

"Q. Had you passed the overhead bridge here south of the depot at Oxford when you got there to the front door?

"A. Yes, sir; it had passed there.

"Q. Passed the bridge?

"A. Yes, sir; and I opened the train door with this hand.

"Q. Which hand is that?

"A. The left hand; and I caught the facing of the door with this hand.

"Q. That is your right hand?

"A. My right hand; and I stepped with my left foot out in front of the door with my right foot on the door facing, standing, there waiting for it to stop for me to step off, and the nigger porter run against me and knocked me off.

"Q. Did he have anything in his hand?

"A. He had a lantern; a light.

"Q. Did you see him waving that, or anything of the sort?

"A. Yes, sir; he was waving a light and hollowing 'Oxford!'

"Q. You say he knocked you off?

"A. Yes, sir.

"Q. Did you strike anything when you went off?

"A. Yes, sir; hit my head on the switch.

"Q. Struck your head against the switch?

"A. The switchboard, they said 'that's where I hit. I don't recollect nothing about it after I got knocked off.

"Q. You say the porter with that lantern in his hand ran against you and pushed you off?

"A. Yes, sir; he run against me and knocked me off.

"Q. What were you doing at the time?

"A. I was just standing still, perfectly still, with my hand on the facing of the door.

"Q. You say he called the station out how many times?

"A. He called it out two or three times. He called it out as he went through, and he called it out as he came back through.

"Q. And that's the time you were taking this Andy McGlon out at the front end?

"A. Yes, sir.

"Q. And he run against you and knocked you off?

"A. Yes, sir; he run against me and knocked me off."

On cross-examination he testified:

"Q. Now, Mr. Warren, who went with you, did you say, to Taylor's?

"A. Mr. J. H. Kelly.

"Q. What did you go there for?

"A. Andy McGlon.

"Q. What had Andy McGlon done?

"A. I had him hired, and Andy went off and never come back, and I went after him.

"Q. Well, you got him, did you?

"A. Yes, sir.

"Q. And you three came back on the train?

"A. Yes, sir.

"Q. When you got on at Taylor's depot, you and Mr. Kelly both got on the train with Andy in the colored coach?

"A. No, sir; we didn't.

"Q. Are you sure about that?

"A. Yes, sir; I am sure about it. I went in the colored coach with him, but I went out.

"Q. How came you to go out?

"A. The conductor asked me did I have him under arrest, and I told him 'No'; that I did not.

"Q. What then?

"A. I had him because he was owing me and had run off from me.

"Q. Why did you get in the colored coach with him?

"A. Well, I wanted to keep him with me. I didn't want him to have any chance to get away from me.

"Q. You were, then, guarding him, were you?

"A. Yes, sir.

"Q. You were watching him pretty close, too, weren't you?

"A. Yes, sir.

"Q. When you got to Oxford and the station was called, you were then riding in the rear part of the coach, the smoking compartment?

"A. I was back in the white coach.

"Q. The colored coach where you went first and where Andy stayed was divided into two compartments, was it not?

"A. Yes, sir.

"Q. The front part of the coach was for colored passengers?

"A. Yes, sir; and one part of it was used for the whites.

"Q. For a smoking car, was it?

"A. It had white people in there. I don't know what it was used for.

"Q. Now, when the conductor asked you if Andy was a prisoner and you told him 'No', he told you to get back in the other coach, didn't he; that you couldn't ride in the colored coach?

"A. Yes, sir.

"Q. And when the station was called out you got up and went out of the white people's coach through the colored coach to the front door?

"A. Yes, sir.

"Q. Why did you do that?

"A. I done that because I wanted to get off and get away as quick as I could.

"Q. Wasn't it easier to get off at the end of the coach in the part that you were in, and isn't that the place that people usually get off out of that part of the coach?

"A. [No answer.]

"Q. Isn't it true that people in that part of the car riding there usually get off at the rear end of that coach, at the end between that and the ladies' coach?

"A. I don't know much about that part of it. I generally get off at the front end of the car.

"Q. Even if you have to go no further to do it, and even if you have to go through the colored coach to do it, isn't that true?

"A. No, sir; I wouldn't have went through the colored coach if I hadn't had him there.

"Q. What 'him' did you have there?

"A. I went through there after my nigger.

"Q. And you went to the front door to be there when he got off, isn't that true?

"A. I went to the front door to be with him when he got off.

"Q. To keep him from escaping?

"A. Well, I don't know as he would have run off, but I didn't want to give him no chance to get away from me. It was dark.

"Q. And that is why you went that way?

"A. Yes, sir.

"Q. Now, this colored porter, you say he came first from the colored coach into the white coach calling out the station?

"A. Yes sir.

"Q. Said, 'Oxford! Oxford! all out for Oxford!'?

"A. 'All out for Oxford!'

"Q. And you got up and preceded him back to the front end, didn't you; went ahead of him?

"A. No, sir.

"Q. Well, who got there first to the front end of the car?

"A. I got there first.

"Q. Then the colored porter came into the front end of the car after you did?

"A. Yes, sir; he came running right in behind me.

"Q. He was running, was he?

"A. He wasn't you [to] say running. He was trotting.

"Q. With a lantern in his hand.

"A. Yes, sir; with a light in his hand.

"Q. What did he do when he got to the door?

"A. I was still standing in the door, right foot on the facing of the door, and left foot on the platform, and right hand on the facing of the door, waiting for the train to stop at the station and to step off, and he run against me and knocked me off.

"Q. Well, what was he doing? You· said something while ago about his signaling?

"A. He was waving his little light, or little lantern."

Warren's brother-in-law, J. H. Kelly, corroborated Warren's evidence, and further testifies that after Warren was knocked off the train he, Kelly, ran out of the door and ran to the bottom of the steps and stood there until the train slowed up and he got off.

The railroad company pleaded the general issue and contributory negligence. On the trial in the court below, after all the evidence was offered, counsel for railroad company moved the court for a peremptory charge to the jury to find for the defendant, which charge was refused and exception duly taken. The jury returned a verdict on which there was judgment for the plaintiff in the sum of $10,000. A motion for a new trial on many grounds was. made and overruled.

The bill of exceptions duly signed and allowed concludes as follows:

"During the entire progress of this trial the plaintiff, James Warren, was brought into the courtroom upon a cot, and with the appearance of a hopeless and helpless cripple for life, with a pale, pinched face and emaciated form,

gave constant evidences of intense and extreme suffering, with frequent groans and pitiable exhibitions of his helpless condition, constantly attended by his wife and two small children, who, in turn, ministered to him, which picture was paraded before the jury with every detail faithfully carried out to play upon and unduly excite the sympathies of the jury. When counsel asked his doctor to examine him, Warren exclaimed with an agonizing appeal not to touch him. Later his attorney proposed to exhibit his physical condition to the jury, but Warren protested so appealingly that the jury with one accord asked that he be not molested. These heart-rendering scenes were so frequent and constant that they, in fact, constituted the opening and closing argument in the case. Its far-reaching appeal and powerful influence upon the jury is forcibly mirrored by their verdict in the case."

The principal errors assigned in this court are:

"Third. The court erred in refusing to grant the peremptory charge asked by the defendant below, wherein it was sought to have the court instruct the jury to find for the defendant below; which was then and there excepted to. as shown by the bill of exceptions on file."

"Fifth. The court erred in refusing to set aside the verdict rendered by the jury in this case (1) because the verdict was excessive, and clearly the result of prejudice and passion excited by the claim that the negro porter had knocked a white man (plaintiff) off the car; (2) and as a result of sympathy for the plaintiff, who was paralyzed, and was lying upon a cot, and was constantly giving evidence of extreme pain and suffering, and was attended by his wife and several small children."

Edward Mayes, for plaintiff in error.
W. V. Sullivan, for defendant in error.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

PARDEE, Circuit Judge (after stating the facts). On a railway passenger train the announcement of the next station, although made on near approach to said station, is not an invitation to a passenger to leave his seat and attempt to alight before the train actually stops. This proposition is supported by Adams' Adm'r v. Louisville, etc., R. Co., 82 Ky. 607; Railroad Co. v. Asbell, 23 Pa. 147, 62 Am. Dec. 323; Jeffersonville, etc., R. v. Hendricks' Adm'r, 26 Ind. 228; England v. Boston, etc., R. Co., 153 Mass. 490, 27 N. E. 1; Lewis v. London, etc., R. Co., L. R. 9 Q. B. 66; Bridges v. North London, etc., R. Co., L. R. 6 Q. B. 377.

According to Warren's evidence, corroborated by his main witness, his brother-in-law, Kelly, on the announcement of the train porter that the next station was Oxford, Warren, for the purpose of resuming custody of the negro McGlon and of getting off and away quickly, left his seat in the smoking compartment while the train was in motion, and went forward through the colored compartment to the front door of the car, which he opened, and stood there waiting evidently for the train to slow down, with his right foot on the door sill, his left foot on the platform, and his right hand on the door facing, from which position he was knocked or pushed, so that he fell off the car while the train was in rapid motion, and thereby was injured In thus going to the front of the car and taking the position described while the train was in rapid motion Warren was guilty of negligence, which unquestionably contributed to his subsequent injury. See Alabama R. Co. v. Hawk, 72 Ala. 112, 47 Am. Rep. 403; Blodgett v. Bartlett,

50 Ga. 353; Beemis v. Railroad Co., 47 La. Ann. 1671, 18 South. 711; Quin v. Railroad Co., 51 Ill. 495; Rockford Co. v. Coultas, 67 Ill. 398; Railroad Co. v. Green, 81 Ill. 19, 25 Am. Rep. 255; Malcomb v. Railroad Co., 106 N. C. 63; 11 S. E. 187; President, etc., v. Cason, 72 Md. 377, 20 Atl. 113; Goodwin v. Railroad Co., 84 Me. 203, 24 Atl. 816; Secor v. Toledo, Peoria & W. R. Co. (C. C.) 10 Fed. 15. According to Warren's evidence, he was pushed or knocked off by the train porter. Neither he nor any of his witnesses testify as to whether the action of the train porter was accidental, negligent, or intended and willful. If the action of the train porter was accidental or even negligent, but not willful, Warren cannot recover from the railroad company, because in taking his position in the door and on the platform of the car, under the circumstances conceded in his evidence, he was guilty of negligence which contributed to his own injury. If the action of the train porter was willfully intended, then Warren can recover, because it is the duty of a common carrier to warn and protect and not to injure a passenger, who may have even negligently exposed himself to injury. A careful analysis of the evidence of Warren and his witnesses, giving full effect thereto and reinforcing the same with the deductions that reasonable men may draw therefrom, brings us to the conclusion that there was no evidence nor deduction from the same sufficient to warrant a finding that the train porter was guilty of willfully pushing or knocking Warren as he stood in the door and on the platform of the moving car. On the whole evidence, direct and circumstantial, the jury would have been fully warranted in finding that the train porter had nothing whatever to do with pushing or knocking Warren from the car.

We conclude that on the evidence of the plaintiff and his witnesses the peremptory instruction to find for the defendant on the issue of contributory negligence should have been given. If the concluding statement in the bill of exceptions means that the jury was unduly influenced in their verdict by their feelings and sympathies for the plaintiff, Warren, and his miserable condition, the trial judge should have granted a new trial on that ground. As, however, the statement of the judge does not specifically find the undue influence and prejudice as a fact, and as he refused a motion for a new trial based on this and other grounds, we must construe the bill of exceptions to mean that, while the facts were as stated, the jury was not unduly influenced thereby.

The judgment of the Circuit Court is reversed, and the cause is remanded, with instructions to set aside the verdict and grant a new trial.

SHELBY, Circuit Judge (dissenting). I respectfully dissent from the opinion just read.

The record shows that on February 3, 1904, James Warren was a passenger on one of the passenger trains of the plaintiff in error. As the train was approaching the station at Oxford, the porter announced the fact by calling, "Oxford! Oxford!" Warren arose from his seat, went to the front door of the coach, opened it, and while standing with one foot on the platform just outside the door, and one foot in the car or on the door sill, holding the door facing with his right hand,

one of the plaintiff in error's servants, the porter of the train, with a lantern in his hand, ran against him and knocked him off the platform, causing him to fall against a switch. By the fall his thigh bone was broken, and the doctor called to see him found the end of the bone "sticking out of his back." He was otherwise so mangled that he died, his death occurring subsequent to the trial and verdict below, and the writ of error is prosecuted against his administratrix.

Warren's account of the accident has been given in the statement of the case by the court. His version is corroborated by J. H. Kelly, who, after describing Warren's position in the door "with his hand placed on the door facing," said that the porter "came rushing through with his lantern, ran against Warren, and knocked him out of the door and clean off to the ground." The plaintiff in error, being a common carrier, was bound, so far as practicable, to protect its passengers, while it was carrying them, from violence committed even by strangers; and there surely can be no doubt that it undertakes absolutely to protect them against the violence and misconduct of its own servants engaged at the time in executing the contract. Stewart v. Brooklyn & Crosstown R. R. Co., 90 N. Y. 588, 591, 43 Am. Rep. 185, and cases there cited; Dwinelle v. N. Y. Central & H. R. R. Co., 120 N. Y. 117, 24 N. E. 319, 8 L. R. A. 221, 17 Am. St. Rep. 611.

It is said in the opinion of the court that "on a railway passenger train the announcement of the next station is not an invitation to a passenger to leave his seat and attempt to alight before the train actually stops." I cannot see how the cases cited to sustain this statement are applicable, because the evidence on which Warren submitted his case to the jury was to the effect that the railway porter had knocked him off the train when he was standing holding to the door facing. Neither of the two witnesses on which he relied to show the negligence or violence of the porter testified that he left his seat and made "an attempt to alight before the train actually stops." It is stated in the opinion of the majority that, "on the whole evidence, direct and circumstantial, the jury would have been fully warranted in finding that the train porter had nothing whatever to do with pushing or knocking Warren from the car." Conceding that to be true—while I take a different view of the evidence—the court has not the right, I think, to take a case from the jury because there is evidence which would warrant a verdict for the defendant. The question of the credibility of Warren and Kelly was for the jury.

The court below submitted the question of contributory negligence to the jury. The opinion just read is to the effect that Warren, on the evidence quoted, was guilty of contributory negligence as matter of law, for it is decided that the trial court should have instructed a verdict for the defendant. In Washington & Georgetown R. R. Co. v. Harmon's Adm'r, 147 U. S. 571, 580, 13 Sup. Ct. 557, 37 L. Ed. 284, the court, commenting on a case where the person injured was standing on the step of the car, observed:

"There was a conflict of evidence as to the condition of the platform, the position of the plaintiff, and the circumstances surrounding the accident. It is conceded that to be upon the platform, or even upon the step, might not

be negligence in all cases, *and certainly not negligence in law*, but it is insisted that the plaintiff was voluntarily riding upon the step of the car when moving, without any means of support, and that this, in the absence of justification or excuse, would necessarily be negligence." (The italics are mine.)

I cannot concur in the view that it is negligence per se for a passenger to arise from his seat when the porter calls the station where he is to alight, and to walk to the door of the car and take the position described in the evidence. Under the circumstances, it could not be deemed negligence per se "if he stood on the steps of the car." Brashear v. Houston Central A. & N. R. Co., 47 La. Ann. 735, 17 South. 260, 28 L. R. A. 811, 49 Am. St. Rep. 382; Watkins v. Bham Ry. & E. Co., 120 Ala. 147, 152, 24 South. 392, 43 L. R. A. 297; Pa. R. Co. v. Reed, 60 Fed. 694, 9 C. C. A. 219; Doss v. M. K. & T. R. R. Co., 59 Mo. 27, 38, 21 Am. Rep. 371. If it is "certainly not negligence in law" to stand on the steps, can it be negligence in law to stand in the door, holding the door facing with the right hand, when the station which is the end of the passenger's journey has been called, and the car is about to stop?

If it were true that Warren was guilty of negligence in taking the position he assumed, it would not be a defense to this action if the conduct of the company's employé, while engaged in the master's service, was intentional and willful. Contributory negligence is not a defense against a willful injury. Beach on Cont. Negl. (3d Ed.) §§ 64, 65; 7 Am. & Eng. Ency. of Law, p. 443. From the violence of the assault which the porter made on Warren, as well as from other facts and circumstances shown in the evidence, the jury might reasonably have concluded that the assault on him was intentional and willful, and in that event the defense of contributory negligence could not have prevailed. In either aspect of the case, the learned trial judge, in my opinion, ruled correctly in refusing to direct a verdict for the defendant.

If the evidence of Warren and Kelly was true, the jury was reasonably justified in finding a verdict for the plaintiff. Taking the case from the jury, therefore, cannot be reconciled with the principles announced in Grand Trunk Ry. Co. v. Ives, 144 U. S. 408, 12 Sup. Ct. 679, 36 L. Ed. 485, nor with the decisions of this court. Nelson v. N. O. & N. E. R. Co., 100 Fed. 731, 40 C. C. A. 673; Texas & Pacific Ry. Co. v. Carlin, 111 Fed. 777, 49 C. C. A. 605; Southern Pacific Co. v. Covey, 109 Fed. 416, 48 C. C. A. 460; Mexican Central Ry. Co. v. Townsend, 114 Fed. 737, 52 C. C. A. 369. In Jones v. E. T., V. & G. R. R. Co., 128 U. S. 443, 9 Sup. Ct. 118, 32 L. Ed. 478, Mr. Justice Miller made an observation, evoked, I think, by the fact that trial courts have been too quick to take cases involving personal injuries from the juries:

"We see no reason, so long as the jury system is the law of the land, and the jury is made the tribunal to decide disputed questions of fact, why it should not decide such questions as these as well as others."

A similar admonition is found in a single sentence of a recent act of Congress—"All questions of negligence and contributory negligence shall be for the jury." Act June 11, 1906, c. 3073, § 2, 34 Stat.

232. The act has no application here, except to show, as does Mr. Justice Miller's observation, that no evolution of the law is in progress that tends to deprive an injured plaintiff of the right to submit his case to a jury.