This action was brought to recover damages for injuries sustained by the negligence of defendant. The plaintiff, T. C. Steele, was on 9 September, 1913, engaged as a carpenter in the construction of a five-story reenforced concrete building for H. L. Grant, defendant, in the city of Goldsboro. Steele is a carpenter by trade, with several years experience, and had been at work on this building since 1 July, 1913. An elevator was used for conveying the material up on the building as it progressed, and for taking trash down, and plaintiff had helped to build this elevator shaft. On the day before the injury plaintiff was told to raise the head block of the elevator above the fifth floor of the building so as to get ready to pour the cement for the fifth floor. On the morning of the injury plaintiff, with others, was engaged in putting in the cut-off plank on the fifth floor under or near the head block which plaintiff had helped to raise the afternoon before. In putting in this cut-off plank it seems to have been necessary to remove one of the braces which was in the way, and plaintiff sent a negro down below to nail on another brace, so that he (plaintiff) could remove the brace that was binding the elevator cable and release the cable. After that had been done, and while plaintiff was in the act of putting in the cut-off plank, one end of this same head block fell, struck plaintiff, and caused the injury complained of. When the head block had been removed so as to permit of the work in hand being done, Bailey, the foreman of carpenters, had his attention (637) directed by plaintiff to the dangerous condition of the head block, if left to rest upon the stiff knee, if the elevator should be moved, *Page 551 
and suggested propping it with a lower head block or the one underneath it; but Bailey refused to let him brace it in that way, so that it would be safe in any emergency, and ordered him "to do what he had been told to do," promising him that the elevator should not be moved, in which case plaintiff's position would have been a safe one. The elevator was moved, and the head block swung around and caught plaintiff, severely injuring his leg and foot, and causing him great pain and suffering, and seriously impairing the usefulness of his leg and foot, the injury being a permanent one.
Plaintiff testified: "I was at work on Grant building on or about 9 September, 1913. I was injured on that morning between the hours of 9 and 10 o'clock. I went to put in a cut-off plank on the fifth floor, where the accident was, where I got hurt. [Here elevator model was exhibited.] This elevator was constructed as most all elevators are. On the morning that I went to work to put in the cut-off plank right here in that floor, the cut-off plank was to be raised 4 inches above that floor. Cut-off board is where the concrete is poured, and to hold the concrete. That was raised 4 inches above this floor on the morning. This head block had been raised the evening before. That went here. There was a little brace that was underneath here (attached to form a stiff knee) to hold this 4x4 before the head block was raised. The head block was resting on the floor the evening before it was raised temporarily, and this brace I put there to hold that (the stiff knee). We had to have this 4x4 (stiff knee) braced so that we could lift this (the head block) up and then brace it after it was raised. The next morning I had to have this brace removed, and therefore I sent a negro down below there to nail on this brace so I could release the cable here in this brace in front. After that was done, and while I was in the act of putting in that cut-off, the head block, the first I knew of it, was coming down on me. I didn't know the elevator was in use. I didn't know they were using the elevator. It was raised temporarily here, and we were not to use it. This elevator was constructed as follows: Those (638) were the guides that went to the basement, where they rested on solid foundation. These guides all the way up were thoroughly braced and nailed secure. Then the head block here (that is, the supporting head block), the first head block that held the guides in position were bolted in there (in the guides) with four bolts running clean through, so, and fastened securely. It being perfectly secure with that head block (the supporting head block) raised under this (the head block), but to take that head block out from under there and raise this head block with the shives in it above this post, this stiff knee in there would not be safe, as this post here (guide-post) didn't come up any further *Page 552 
than this (fifth) floor — right here; but to take this head block (supporting head block) and raise it up under there, then that holds that (the head block containing the pulleys or shives) and supports that and relieves the weight on this 4x4 (stiff knee). You can then brace them all the way around here. There was only one brace on this on the morning that I went there to put in the cut-off plank. This head block was not raised as it is now. I went to do this work under the direction of the foreman. I suggested to him to raise this head block under this as it is now. He told me it was not necessary, as he was the foreman, and I would do what I was told there. The foreman was Bill Bailey. The evening before this head block was resting right across here, on this floor here. It was in our way. We had to put in that cut-off, and had to raise it temporarily to get it out of the way. They were all in a rush there to get the floor poured. All the hands had something to do, and this had to be raised. It was raised up on this stiff knee here. There was no post up there to make it secure. I stated that I was doing this work under the direction of Mr. Bailey. Mr. Bailey was carpenters' foreman. He directed me to raise the head block on Monday evening, 8 September. After we raised the head block in the position that it is now, I went to Mr. Bailey and asked him could I raise the other head block under this one to support it, and he told me it was unnecessary; it was only raised temporarily. I understood him to say, at the time, it would not be operated in the condition it was at the time it (639) fell. It would have been perfectly safe, and would not have fallen if it had not been put in use. On that evening, Bob Lee, labor foreman, was told by Bailey, in my presence, the elevator was in no condition to use, and instructed him not to use it. He (Lee) was working on the third floor, cleaning up trash. On the morning that I started to work to put in this cut-off I went to Mr. Bailey and asked him if the elevator was going to be used. He said it was not. They were not going to use the elevator that morning. I went over there to fix it and started to work. I had been at work half an hour when it fell. There was no defect in the construction of the elevator. The defect was when it was raised temporarily, as the position it now stands in. If this head block had been raised up under here, where it should have been, it would have been safe. There is where the defect was. If this head block had been raised under here and then bolted as down here, there was no possible chance for that to have fallen, but if it had fallen, it would not have caught me. It would have fallen over here, and struck the floor, and not toppled over here on me. It was this stiff knee in that that held it up there at the time it fell. It was all that held it up. I didn't send anybody down to knock that brace off; I reached down there *Page 553 
and took it off. It was a little four-penny nail. I sent him down to nail that on so I could knock this off. I just pulled out this little four-penny nail, driven halfway in. After I took this brace off we had then sawed our plank, and I was starting to stick this in here when the elevator fell. I don't know how long it was after I took this brace off before the elevator fell. The stiff knee gave way down here at this place. It broke. I could not say whether it was at a joint or below. I saw it hanging down there after it was done (broken). I was in so much misery and suffering so I could not tell exactly where it did break. I could see the elevator as my body was laying over there. The stiff knee was all right until there was weight put on that. It would have held up that head block, it would have held that up, but not the load that was on it. It was safe a-plenty to have held the head block. I could not tell the exact position of the stiff knee, I was suffering so much. I (640) did not see the condition after I was taken down."
M. H. Moore testified: "I was at work as a carpenter on the Grant building on the morning of 9 September. I was near-by at the time of the injury. On the evening before the injury occurred on the 9th, I heard something said between Steele and Bailey about the elevator. I could not say word for word; I know there was something said. The substance of it was that Bailey told plaintiff that the elevator was not safe for operation. I could not be positive who he was speaking to; they were all there together. Mr. Lee is the labor foreman, best I understood it; he had charge of that part of it. That stiff knee in here, that one, that had been pieced, broke, and the head block swung around, gate fashion, and caught Mr. Steele, and he was laying under it when I got there. We tried to raise the head block off of him, and could not do it, and called to the edge of the building to the engineer to lower the elevator, so that we could lift the head block off Mr. Steele. This portion of the elevator at the time would weigh 600 or 700 pounds. I did not notice whether or not the elevator was loaded at the time."
There was testimony of a medical expert as to the nature and extent of the injuries.
Defendant introduced no testimony, but at the close of plaintiff's, he moved for judgment of nonsuit, which was refused, and he excepted. Verdict and judgment for plaintiff, and appeal by defendant.
After stating the facts: There was evidence of negligence in this case, which we must assume was properly submitted to the jury *Page 554 
in the charge of the court, as the latter was not sent up. The general rule as to the duty of the master in respect to the place of his servant's work, and tools and appliances furnished to him for the purpose of doing the work, and as to structures which he is engaged in erecting, (641) was conceded, and may be thus formulated: The duty of the master to provide reasonably safe tools, machinery, and place to work does not go to the extent of a guarantee of safety to the employee, but does require that reasonable care and precaution be taken to secure safety, and this obligation, which is positive and primary, cannot be avoided by a delegation of it to others for its performance. The master's duty, though, is discharged if he does exercise reasonable care in furnishing suitable and adequate machinery and apparatus to the servant, with a reasonably safe place and structures in and about which to perform the work, and in keeping and maintaining them in such condition as to afford reasonable protection to the servant against injury. R. R. v.Herbert, 116 U.S. 642; Gardner v. R. R., 150 U.S. 349; R. R. v. Baugh,149 U.S. 368; Steamship Co. v. Merchant, 133 U.S. 375. This undertaking on the part of the master is implied from the contract of hiring. Hough v. R. R., 100 U.S. 213. The rule was stated and applied inMincey v. R. R., 161 N.C. 467, citing the above authorities, and it has been frequently recognized in many other cases. The difficulty is not in the expression of the principle, but in the application of it to any given statement of facts. But this case does not present any such difficulty, as the facts are simple and practically uncontroverted. It was the plain duty of the defendant, when plaintiff was ordered to work on the fifth floor of the house he was then building, to see, in the exercise of proper care, that he had a reasonably safe place and surroundings for the performance of the task assigned to him, viz., putting in the cut-off plank to receive the concrete and hold it. It is hardly necessary to argue that he failed to do this, for construing the evidence most favorably for the plaintiff, as we are required to do, it appears that the head block had to be raised in order to do the work, and it was accordingly raised and placed upon the stiff knee. Owing to the nature of the latter, this produced a dangerous condition, and plaintiff suggested that it be done another and a safe way, but his suggestion was not heeded, and he was ordered to adopt the dangerous way, with the promise that he would be protected in his work against injury from the head block by (642) keeping the elevator still, which, if it had been done as promised, would have prevented the injury. But the elevator was moved, and the shafting or stiff knee being too weak to support and hold the head block, it swung around and caught the plaintiff, inflicting the injuries of which he complains. The elevator was placed there to be *Page 555 
used, and not to remain idle. It was likely to be started at almost any moment, unless proper precaution was taken to prevent it. The position of the plaintiff was safe if the elevator was not moved, but by reason of the weakness of the shaft or stiff knee, it was rendered dangerous if it was moved. So we have a case where the master uses a defective appliance to hold up the head block at the top of the elevator, and this combines with the negligence or willfulness of some one, in moving the elevator, to cause the injury. We have two acts of negligence cooperating to produce the injury, neither one of which would have done so without the presence of the other. These are reasonable inferences the jury might have made from the evidence as it is now presented, and they were properly allowed to pass upon it. It is a familiar principle that the negligence of the master, when uniting with some other negligence, and the two together directly causing the injury, makes the master liable, even though his negligence was only a contributing cause, and the other cooperating negligence was that of his employee's fellow servant or of a stranger. The law will not, under such circumstances, apportion the liability, but requires the master to be sure, when one of his servants is negligent and injures another servant in the same employment, that he is free from culpable blame; otherwise the law will hold him responsible to the injured servant, as much so as if his own negligence had been the sole cause of the injury. Moore v. Contracting Co.,149 N.C. 177. This doctrine was applied in that case, citing 12 Am. and Eng. Enc. of Law (2 Ed.), p. 905, where it is said: "It is a familiar principle that where an injury is caused by the concurring negligence of two persons, either or both may be held responsible. The application of this general rule in the law of master and servant is not affected by the fellow-servant doctrine. Where the negligence of the master is combined with the negligence of a fellow-servant in producing (643) the injury, and the negligence of neither is alone the sufficient cause, both the master and the fellow-servant are liable, and the injured servant may maintain his action against either or both together. The application of this rule occurs mostly in cases where the master is sued. That a master is liable for an injury to his servant caused by the concurrent negligence of himself and a fellow-servant, but which would not have happened had the master performed his duty, is clear; it is only where the negligence of a fellow-servant is the whole cause of the injury that the master is excused. And while contributory negligence may relieve a master from liability, it must be that of the person injured; it is immaterial that the negligence of a third person contributed to the injury. If, therefore, a servant who is himself free from negligence receives an injury, caused in part by the negligence of his master, or, *Page 556 
what amounts to the same thing, of a servant for whose negligence the master is responsible, and in part by that of a fellow-servant, he can maintain an action against his master for such injury."
The principle has found frequent and varied expression in the books. Where a seaman was killed by the explosion of a steam valve, due to the concurring negligence of the master in arranging the pipe to which it was attached in an unsafe manner and the negligence of the servant in opening the valve, it has been held that the master was liable.Southern Pacific v. Dacasta, 190 Fed. Rep., 689; 111 C.C.A., 417. "A master is liable for the injury to his servant, who is free from contributory negligence, where it is caused by the concurrent negligence of the master or his vice principal and a fellow-servant." 26 Cyc., 1302. "A servant does not assume the risk from the negligence of a fellow-servant augmented by that of the master." Humphrey v. Raleigh C.and C. Co., 80 S.E. (W.Va.), 803. It has been said that while an employee cannot recover for personal injuries if the negligence of a fellow-servant was the proximate cause of the injury, if the injury is caused by the employer's negligence, as by furnishing defective machinery, the employee may recover even though the negligence of a (644) fellow-servant was a contributory cause of the injury. Helley v. Perkins Machine Co., 102 N.E. 944. It has also been held that an employee can recover for an injury caused by the negligence of his employer in providing a defective angle cock on the air-brake hose of an engine about which he worked, although the negligence of the engineer in moving the train while he was between the cars was also a proximate cause of the injury. Watson v. A. C. L. Railway, 74 S.E. 121. The duty of a master to provide reasonably safe tools and machinery and place to work does not go to the extent of a guarantee of safety, but does require that reasonable precautions be taken to secure safety; and this obligation cannot be avoided by delegating it to others. The duty of exercising reasonable care in furnishing suitable and safe machinery and appliances, and keeping them in repair, is a personal obligation which the master cannot rid himself of by delegating it to an agent to perform. If instead of himself performing the positive obligations which he owes to his servants, the master engages another to do them for him, he is liable for the neglect of that other, which is the neglect of the master to do the things which it is his duty to perform. It therefore follows that the duty of the master is not performed by the appointment of an agent to supply reasonably and adequately safe instrumentalities for the servant, but he is liable if the agent fails to do so. It being the duty of the master to exercise reasonable care to furnish suitable machinery and appliances and repair and inspect the same in proper *Page 557 
instances, and to provide a reasonably safe place in which to do the particular work assigned to his servant, he cannot interpose as a defense to an action for an injury to the employee the neglect of another servant to perform that duty for him; nor, where the negligence charged against him is the failure to supply a reasonably safe place to work, the master cannot escape liability upon the ground that a particular act of negligence was that of a fellow-servant. The negligence of the latter must be unmixed with his own in order that his plea can be available to him, provided the negligence of the two united and constituted the proximate cause of the injury. These principles are fully sustained in the following cases: B. and O. R. Co. v. Baugh, 149 U.S. 368; (645)Hough v. T. and P. R. Co., 100 U.S. 213; N. P. R. Co. v. Peterson,162 U.S. 346; U. P. R. Co. v. Snyder, 152 U.S. 684; N. P. R.Co. v. Herbert, 116 U.S. 642, where the subject is exhaustively discussed. They are also approved in Barkley v. Waste Co., 147 N.C. 585
(s. c., 149 N.C. 287); Tanner v. Lumber Co., 140 N.C. 475;Avery v. Lumber Co., 146 N.C. 592. It has been held by us that this duty of the master to exercise due care in furnishing his servant with reasonably safe machines and instrumentalities with which to do the work and a reasonably safe place in which to perform it, cannot be safely neglected by him, and his failure in this duty exposes the employee "to extraordinary risks and hazards." Moore v. R. R., 141 N.C. 111. The master is not only liable to his servant for the neglect of a nonassignable duty, that is, one that is primary, personal, and positive, and for the neglect of his representative if he delegates it, and for his own neglect even if it unites with that of a fellow-servant, causing the injury, but he is also liable "when the other servant occupies such a relation to the injured party, or to his employment in the course of which his injury was received, as to make the negligence of such servant the negligence of the employer." Q. S. S. Co. v. Merchant, 133 U.S. 375. The principle was well stated and applied in N. Pac. R. v. Peterson,supra, where Justice Peckham said: "The general rule is, that those entering into the service of a common master become thereby engaged in a common service and are fellow-servants, and prima facie the common master is not liable for the negligence of one of his servants which has resulted in an injury to a fellow-servant. There are, however, some duties which a master owes, as such, to a servant entering his employment. He owes the duty to provide such servant with a reasonably safe place to work in, having reference to the character of the employment in which the servant is engaged. He also owes the duty of providing reasonably safe tools, appliances, and machinery for the accomplishment of the work necessary to be done. He must exercise proper diligence in the employment of *Page 558 
reasonably safe and competent men to perform their respective (646) duties, and it has been held in many States that the master owes the further duty of adopting and promulgating safe and proper rules for the conduct of his business, including the government of the machinery and the running of trains on a railroad track. If the master be neglectful in any of these matters, it is a neglect of a duty which he personally owes to his employee, and if the employee suffer damage on account thereof, the master is liable. If, instead of personally performing these obligations, the master engages another to do them for him, he is liable for the neglect of that other, which, in such case, is not the neglect of a fellow-servant, no matter what his position as to other matters, but is the neglect of the master to do those things which it is the duty of the master to perform as such."
Applying this well settled doctrine to the case in hand, we find that the lift or elevator was in a defective condition, which was called to the attention of the foreman. If he, or any subordinate to whom he intrusted this primary duty of the master to cure the defect or to guard against its evil consequences, neglected the duty, the defendant, as master, was responsible just the same as if he had been personally present and acting for himself; and there was also some evidence from which the jury might have inferred that Bailey, the foreman, stood, in his relation to the defendant, as a vice principal.
But there was superadded to the default of the master, in having defective shafting, the express promise of the foreman that he would see to it that the servant's position was not made dangerous thereby, while he was engaged in performing his work. That is, in its legal character and essence, not unlike a promise to make needed repairs, called to the master's attention by the servant, in which case the rule is thus stated in 1 Labatt on Master and Servant (Ed. of 1904), sec. 421: "After the servant has shown that there has been a promise, actual or implied, on the part of the master, and that this promise amounts to an undertaking to remove, not only a danger, but a danger by which he himself is threatened, he still has the onus of proving that the inducing motive of his continuance in the employment was his reliance upon (647) the fulfillment of the promise. Recovery cannot be had where the only reasonable inference from the testimony is that the servant continued work, not because he relied on the master's promise, as given, but merely because of an expectation, based on the defendant's habit, that he would make the repairs in question. But the mere fact that the servant has some suspicion that the master's assurances will not be made good is not enough to deprive him of his right of action. When complaining of defective instrumentalities or machinery it is not *Page 559 
necessary that the servant shall state in exact words that he apprehends danger to himself by reason of the defects, nor need there be a formal notification that he will leave the service unless the defects be repaired or remedied. It is sufficient if, from the circumstances of the case, it can be fairly inferred that the servant is complaining on his own account, and that he was induced to continue in the service by reason of the promise." We cannot, therefore, say that there was any assumption of risk or contributory negligence on the part of the plaintiff. As the evidence is now presented, there was none. It does not appear who moved the elevator — whether it was done by Lee, the labor foreman, or one of his subordinates, or by a stranger. In the view we take of the case, it can make no material difference by whom it was moved, as it was the duty of the master, who had made the promise through his representative, to use due care in protecting the plaintiff while at his work, and there is evidence that this was not done. It was held in Keating v. Hewatt, 99 N.E. (Mass.), 479, a case much like this one in its facts, that an employer is responsible for injury to an employee resulting from the foreman's negligent failure to protect the employee against injury at a machine, after assuring him that it would not start while he was working at it, and that it could be found by the jury that the injury was due solely to the negligent failure of the foreman to secure this promised protection after he had exposed the plaintiff to danger. For such negligence of the foreman, the employer is responsible. Floettle v.R. R., 41 N.J. Sup., 792. We said recently in Lynch v. R. R.,164 N.C. 249: "In Whitson v. Wrenn, 134 N.C. 86, the master had instructed the servant to do the work in a way that was safe, and he elected to disobey the orders and do it in a dangerous way, (648) and we held that he could not recover for the injury caused by a departure from his instructions, because the fault was all his own. Not so here, but the contrary. It is the converse of that case. The servant selected a safe method of doing the work, and the master ordered him to desist and do it in a dangerous way. The injury was, therefore, caused by the master's fault, and fixes him with responsibility for it. There is no pretense that the servant was guilty of any contributory negligence, and could not be, under the facts. Orr v. Telephone Co.,132 N.C. 691." That case was approved, at the same term, in Watsonv. R. R., 164 N.C. 176.
We, therefore, conclude by the application of well defined principles of the law that the case was properly submitted to the jury. The only exception taken in the record and discussed in the brief was directed against the refusal to nonsuit, and that matter, as we have seen, was correctly decided by the court, in almost any view we can take of the *Page 560 
evidence for the plaintiff, and certainly so when we adopt the one most favorable to him.
No error.
Cited: Ridge v. R. R., 167 N.C. 525; Cochran v. Mills Co., 169 N.C. 61;Lynch v. Veneer Co., 169 N.C. 172; Yarborough v. Geer, 171 N.C. 336;Wooten v. Holleman, 171 N.C. 464; Vogh v. Geer, 171 N.C. 679; Dunn v.Lumber Co., 172 N.C. 136; Taylor v. Power Co., 174 N.C. 587; Beck v.Tanning Co., 179 N.C. 125; Newton v. Texas Co., 180 N.C. 565; Comrs. ofJennings, 181 N.C. 399; Cook v. Mfg. Co., 183 N.C. 56; Beck v. Chair Co.,188 N.C. 746; Perkins v. Wood Coal Co., 189 N.C. 607; Paderick v.Lumber Co., 190 N.C. 312.