GRADY H. RIDGE v. NORFOLK SOUTHERN RAILROAD COMPANY.

(Filed 16 December, 1914.)

**1. Trials—Nonsuit—Evidence.**

In the suit of an employee against his employer to recover damages for a personal injury, it is necessary that the plaintiff's evidence should be sufficient to show actionable negligence, but a motion to nonsuit will not be granted when there is legal evidence of such negligence.

**2. Negligence—Evidence—Res Ipsa Loquitur.**

When a thing which causes injury is shown to be under the management of the defendant, and the accident is such as under the ordinary course of things does not happen if those who have the control of it use the proper care, it furnishes evidence, in the absence of explanation by the defendant, that the accident arose from the want of care, under the doctrine of *res ipsa loquitur.*

**3. Same—Railroads.**

When there is evidence that an employee of a railroad company was on the roof of a box car in a train of sixteen cars in the course of his duties, and was injured by the roof of the car blowing off, in a wind so slight that he had stood thereon without difficulty, and that the roofs of the other cars remained intact, the doctrine of *res ipsa loquitur* applies.

**4. Evidence—Res Ipsa Loquitur—Burden of Proof.**

The doctrine of *res ipsa loquitur* applying to the evidence of a case does not relieve the plaintiff of the burden of proof required of him, the effect of this doctrine being only that sufficient evidence has been introduced to take the case to the jury.

**5. Railroads—Master and Servant—Evidence—Negligence—Res Ipsa Loqui-tur.**

It is negligence for a railroad company to permit the walkway upon the top of its box cars, which its employees are required to use in the course of their duties, to become so rotten, or otherwise defective, that an ordinary wind, will blow it off; and conditions of this character being particularly within the knowledge of the railroad company, and not necessarily known to the train crew using it, the doctrine of *res ipsa loquitur* does not become inapplicable merely for the reason that it is invoked by an employee who has been injured by a defect of this character, especially when the employee thus injured was inexperienced, and learning the business of railroading at the time of the injury.

**6. Same—Federal Employers' Liability Act.**

The doctrine of *res ipsa loquitur* applies, in proper instances, to an action brought under the Federal employers' liability act.

**7. Railroads—Master and Servant—Negligence—Order of Vice Principal—Dangerous Condition.**

Evidence tending to show that the conductor on defendant's freight train ordered the plaintiff, an inexperienced hand learning the business under him, to go along the top of a moving train in a wind sufficiently strong to take the roof off of the car, which was defective, and injure him, when he must have observed or known of the danger, affords direct evidence of the, defendant's negligence, although the evidence was conflicting as to the force of the wind.

**8. Railroads—Master and Servant—Safe Place to Work—Inspection—Foreign Car—Negligence—Evidence.**

In an action to recover damages against a railroad company for an injury to the plaintiff received while in the course of his employment by the top of a box car being blown off by the wind, striking him and carrying him to the ground, there was evidence tending to show that the planks of the roof of the car, an old one, were seen by the plaintiff. just prior to the injury, "jumping up and down"; that the car belonged to another railroad company, but it could readily have been inspected by the defendant, under the circumstances, considering its location and the defendant's usual methods of inspection. *Held*, it was sufficient evidence that the planks on top of the car were not properly nailed or fastened, and of the defendant's actionable negligence in failing to discover the defects of the car by reasonable inspection and remedy it.

**9. Same—Vis Major—Concurrent Negligence.**

It is the duty of the master to furnish the servant with a reasonably safe place to do his work, under the rule of the ordinarily prudent man with reference to his own safety, and when the master fails in this respect and his negligence concurs with conditions over which he has no control, in producing an injury to an employee, it will be held as the proximate cause of the consequent injury; and where an injury to its train hand is caused by the negligence of a railroad company to provide a box car reasonably safe for the purpose of his going along its top in the performance of his duties, and in consequence, during a windstorm, the roof of the car is blown off and hurls the plaintiff to the ground to

his injury without other or intervening cause, the doctrine of *vis major* will not apply, and the negligence of the defendant will be held the proximate cause of the resulting injury.

10. **Master and Servant—Railroads—Inspection of Cars—Trials—Absence of Witnesses—Evidence.**

Where there is evidence that a personal injury was inflicted upon an employee of a railroad by reason of the failure of the company to inspect a defective box car, the absence of the railroad's inspector as a witness justifies the jury in drawing inferences unfavorable to the defendant, in an action for damages, upon the issue of its negligence in this respect.

11. **Negligence—Concurrent Causes—Proximate Cause.**

Where two causes coöperate to produce an injury, one of which is attributable to the defendant's negligence, the latter becomes liable, if together they are the proximate cause of the injury, or if the defendant's negligence is the proximate cause.

12. **Master and Servant—Negligence—Safe Place to Work—Ordinary Care—Definition.**

The measure of care against accidents which a master must take to avoid responsibility for injuries to his servant in the performance of his duties is that which a person of ordinary prudence and caution would use if his own safety were to be affected and the whole risk were his own.

13. **Master and Servant—Negligence—Co-operating Cause—Apportionment of Liability.**

Where the master's negligence contributes to the result of the servant's injury, although there may be a coöperating cause, not due to the servant's act, the law will not undertake to apportion the liability, but will hold him responsible to the servant in the same degree and with the same consequences as if his negligence had been the sole cause of the injury.

14. **Evidence—Opinion—Expert—Evidence as to Fact.**

In this action to recover damages for a personal injury it is held competent for a medical expert to testify, within his own knowledge, that the plaintiff's vertebræ had been crushed in the accident, for which damages are claimed, and for him and other physicians, who have qualified, to give their expert opinion as to the effect of this condition upon the plaintiff.

15. **Measure of Damages—Evidence—Personal Injury.**

In an action to recover damages for a personal injury alleged to have been caused by the defendant's negligence, it is competent for the plaintiff to testify, upon the question of the measure of damages, as to his trade or business and proficiency therein, and how the injury had reduced his earning capacity.

APPEAL by defendant from *Adams, J.,* at July Term, 1914, of RANDOLPH.

This is an action to recover damages for injuries alleged to have been caused by defendant's negligence. The testimony of the plaintiff in his own behalf will sufficiently show the nature of the case and enable us to understand the exceptions:

He is 23 years old, had lived in Ashboro for about seventeen years, and had worked for the Norfolk Southern Railroad Company, beginning on 4 August, 1913. Started as flagman; didn't have any special run, but was a new man and was put anywhere on the road when they had a vacancy. Didn't remember how many days he had worked from 4 August until 20 October. In August he drew $31 as his wages, and they paid him anywhere from $1.65 to $2 a day. After September his wages were right at $30, and in October $30. On 20 October he started out with a fellow Brown on a baggage run; Brown was showing him how to handle baggage on a passenger train from Fayetteville to Raleigh, on a Norfolk Southern train. Brown had held the baggage man's position, and was teaching the witness how to be a baggage man. They went to Raleigh, and, on arriving, they set off the passenger coaches and picked up a string of box cars and started back to Fayetteville. There was one passenger car on the train, and the conductor was Fred Jones. Witness was in the passenger coach when the train left Raleigh. Fred Jones, L. P. Brown, and a colored fellow, a brakeman, were in there with him; he did not remember the colored fellow's name. He went out of the passenger coach to a station or two along the road to help unload some stuff and set off some cars.

Plaintiff was then asked the following question: .

"Were you subject to the orders of the conductor?" Defendant objected, objection overruled, and defendant excepted. Answer: "Yes, sir; I was." Plaintiff testified further: "Just before they got to Cardenas, Brown himself and a colored brakeman were in the coach, and the conductor said: 'Boys, go across and get ready to unload the freight at this station' (Cardenas). And these fellows started on, and Brown said, 'Come on, Ridge.' So we started out; went on top of the box car. The train was in motion at the time, and the way you cross a box car is to get out of the coach, walk out on the platform, climb the ladder to the top, and then walk on top clear across, if there is nothing to prevent you. There is a walkway on top of the car for the passage of the railroad hands, and there was one on this car. We started across on the top of the car, and there was an oil tank on the train next to this box car, in front of it. We had to go across the box car to get to the oil tank, and these fellows had climbed down the ladder of the box car to get to the oil tank, and I was walking up toward the end where I had to get down, and I noticed some plank jumping up and down on the box car, but I didn't think anything about that, and I don't remember anything

167—33

RIDGE *v.* R. R.

then until I came to myself. I was on the ground bleeding, with a box car on me. The last I remember was the planks jumping up and down. Then they took me on a freight train, and carried me to some station, and put me in a waiting-room on a cot; and later there was a passenger train that came by, and I remember riding in a passenger coach, or baggage car, to Raleigh." Plaintiff then stated the extent of his injuries, which were quite severe. He further testified that he had never been over that road before, and was being broken into the service as a beginner. It was level country where the injury occurred. It was not blowing very hard, not so hard that it blew him nearly off the car. The wind was blowing to some extent. It had been blowing all day, but just a little now and then, and not steadily. He did not know whether the wind increased in velocity after he went out of the coach.

F. H. Jones, the conductor, testified in behalf of defendant: "I had trouble in getting over, the wind was blowing so hard. I couldn't hold on, and a time or two I had to grab the running-board and crawl from one car to the other. It was a very hard wind. I did not look to see whether others were coming or not. We were running west at the time. I saw where the top of the car blew off. It was on the right of the railroad track, going west; the left side blew off. The top is made into two parts, with a slight shed on each side so that it will shed the water. Each half is separated from the other in the middle. I do not know how heavy the top is; it looked like pine with tin under it. It tore the tin off. I saw the rafters left on the car, and they looked to be in good condition; saw no defects in the wood or anything of that kind. . . . Ridge was learning to flag the road between Raleigh and Fayetteville. He was along with Brown so that he could learn his duties. There were fifteen box cars on that train; none of the other tops blew off. I do not remember sending Ridge back to flag at tank. I didn't do it; didn't give him any orders at all. I did not send him back to flag at tank right out of Raleigh. There was a very hard wind blowing. I crawled over the car, and walked a little bit until the wind blew so hard that I had to grab the running-board. I walked a step or two at the time, something like that; I did not look back to see the others. Brown was right behind me. Do not know how far the colored man was behind. Do not know whether all four were on the top of the car at the same time or not. The wind was coming from the south. That violent wind was blowing all day, and was harder after we left Raleigh. It was blowing harder at this place where Ridge was blown off than it was in Raleigh. The wind quieted down that afternoon. I do not know how a standard box car is built; I have seen them put together. I know the roof is nailed on; there is a tin lining underneath the wood, which extends all over the top of some cars; I think it did on this car."

There was much evidence pro and con in regard to the velocity of the wind and the condition of the car's top.

R. H. Jones, defendant's witness, testified that the car returned to Raleigh "with the left-hand side blown off and one-half of the roof was gone," and there was evidence that the other cars, fifteen freight cars in all, were not injured. The car in question was loaded with hay.

The court, in its charge, stated the contentions of the parties: the plaintiff's, that the top of the car was defectively constructed or out of repair, and by reason thereof the wind lifted it and threw it and him violently to the ground; and the defendant's, that the car was not defective, but the wind was high and blew plaintiff off, and that it had carefully inspected the car. The court then drew the attention of the jury to the Federal employers' liability act, reading section 1 to them, and charged them to inquire, under the issues, whether defendant had been guilty of negligence in any of the respects mentioned in that section, if they found that it was, at the time, engaged in interstate commerce, and that plaintiff, at the same time, was employed in such commerce, and particularly to inquire if defendant had exercised ordinary care (defining and explaining it) to see that the car was in reasonably safe condition for the use of its hands, if they found that the car was defective and that it was the proximate cause of the injury. If the car was in a defective condition and defendant had not made a reasonable inspection of it; whereas if it had, the defect would have been discovered, and that by reason of the defect, the top was blown off and against the plaintiff, so that he was thrown to the ground and injured, and that the negligence of the defendant in the particulars mentioned was the proximate cause of the said injury, they would answer the first issue "Yes"; otherwise, "No."

The court then fully stated and explained the defendant's evidence and contentions, and then gave this instruction, among others:

"Defendant contends, then, that you should find from the evidence that this was what is known as an unusual and extraordinary wind and that the injury caused the plaintiff, if you find that it was caused by the removal of the car roof, was due to the unusual and extraordinary velocity of the wind, over which the defendant had no control and for which it could not, in the exercise of reasonable care, have provided. If you find from the evidence that on the occasion referred to the wind was unusual and extraordinary, and that the top of the car would not have been displaced and the plaintiff would not have been injured except for such unusual and extraordinary character of the wind; that is to say, if you find that the unusual and extraordinary character of the wind was the proximate cause of the plaintiff's injury, you will answer the first issue 'No.' Now, what is meant by a wind that is unusual and extraor-

dinary? In the meaning of this instruction, an unusual and extraordinary wind is such as could not reasonably have been anticipated and expected by the defendant in the climate at the season of the year and in the section of the country when and where the injury is alleged to have occurred. Now, applying this definition to the evidence, how do you find? Was this wind an extraordinary wind? Was it a wind which could not reasonably have been anticipated and expected by the defendant at that season of the year, at that place, in that climate, at the time the injury is alleged to have occurred, or was it such wind that the defendant might reasonably have anticipated and expected? These are questions, gentlemen, for you to determine from the evidence. The defendant contends that it was unusual and extraordinary. Plaintiff contends that it was not."

The court then correctly instructed the jury as to the other issues. The jury returned this verdict:

1. Was plaintiff injured by the negligence of the defendant, as alleged in the complaint? Answer: "Yes."

2. Was the plaintiff, at the time of the alleged injury, employed by the defendant in interstate commerce? Answer: "Yes" (by consent).

3. What damages, if any, is plaintiff entitled to recover? Answer: "$4,750."

Judgment was entered therein, and after duly reserving its exceptions, the defendant brought the case here by appeal, and assigned the following errors:

1. That the court erred in refusing to nonsuit the plaintiff when plaintiff rested and closed all the evidence, as set out in defendant's exceptions Nos. 4 and 5.

2. That the court erred in charging the jury, as set out in defendant's exception No. 6, which is as follows: "If you find from the evidence that the defendant engaged the plaintiff to take Brown's place as flagman on its train on Tuesday morning, 21 October, and engaged him on the day preceding, Monday, 20 October, to go on its train from Fayetteville to Raleigh, and from Raleigh back to Fayetteville, in order to learn the road or to become more familiar with the duties that would be required of him as flagman, before undertaking in fact to perform these duties, and it became necessary for the plaintiff in doing the service required of him on Monday to walk on top of the car in front of the caboose, you will then find that it was the duty of the defendant to use ordinary and reasonable care to see that the top of the car was in a reasonably safe and suitable condition for this use, and, in the exercise of such care, to examine or inspect the car from time to time with a view to knowing its condition; and if you find that the defendant failed to exercise such care, you will then find that it was negligent."

3. That the court erred in giving that portion of the charge as set out in exception No. 7, which is as follows: "And if you further find from the evidence that the top of the car on which the plaintiff was required to walk was not in a reasonably safe condition, and that when the plaintiff, in the performance of the duty required of him at that time, was walking on the top of the car, the left side of the car was blown from its position against the plaintiff, and that the plaintiff was thereby thrown to the ground and injured, and that the defendant's negligence was the direct and proximate cause of the injury, you will answer the first issue 'Yes.' If you do not find these to be the facts, you will answer it 'No.'"

The motion to nonsuit makes this statement necessary, though it is only a small portion of the evidence, which is very voluminous.

*Hammer & Kelly for plaintiff.*
*J. T. Brittain, W. B. Rodman, and J. A. Spence for defendant.*

WALKER, J., after stating the case: The counsel of defendant, in their argument before us, and also in their brief, laid great stress upon the position that there was no evidence that the car from which the plaintiff fell was defective, and for this reason the instructions of the court, to which they had excepted, were unwarranted and erroneous, and not that they did not state correctly the legal principle applicable to the case, if there had been such evidence. Defendant also moved to nonsuit for the same reason. We agree with them that it is necessary, in all cases, that there should be evidence from which the jury might reasonably and properly infer that there was negligence (*Wittkowsky v. Wasson,* 71 N. C., 451; *Byrd v. Express Co.,* 139 N. C., 273; *Crenshaw v. Street Railway Co.,* 144 N. C., 320), but we do not concur in the statement that there is no such evidence of negligence in this case. If we were permitted to restrict our inquiry to the evidence introduced by the defendant, we might assent to the conclusion of the learned counsel; but we are required to examine both sides of the case—to hear and consider what each has said about the tragedy. They stoutly resist the plaintiff's assertion that the doctrine, *res ipsa loquitur,* applies to the case; but we think it does.

The undisputed facts, in this connection, are these: There were at least fifteen box cars in the train, and a caboose, from which the men started when ordered to make themselves ready for loading and unloading at Cardenas, the next stopping place. There is no evidence that the roof of any of those fifteen cars was blown off by the wind except the one in question, on which plaintiff was standing at the time he was carried away, with the roof of the car, by the wind, to the ground, the roof

falling from left to right. It was the roof that struck the plaintiff, after being torn by the wind from its fastenings, and forced him to the ground.

Plaintiff testified that the velocity of the wind at the time he was blown off was so slight that he could stand on top of the car without difficulty. When the top of a box car blows off under these circumstances, the conclusion is quite irresistible that the top was defectively constructed. The eaves of a box car project only a few inches from the body of the car, and the pressure of the wind against the eaves would not be as great as against a man standing on top of the car.

These facts alone make a stronger case for the application of the doctrine of *res ipsa loquitur* than any of the cases in which our Court has recognized the doctrine.

This maxim of the law, *res ipsa loquitur,* extends no further in its application to cases of negligence than to require the case to be submitted to the jury upon the face of the evidence as affording some proof of the fact in issue. The jury are not bound to decide accordingly; but if they think proper to do so, when applying their reason and common sense to the case, they may reject the conclusion that there was negligence and ascribe the injury to some other cause. It merely carries the case to the jury for their consideration, and is bottomed upon this logical principle, as decided in many cases: When a thing which causes injury is shown to be under the management of the defendant, and the accident is such as in the ordinary course of things does not happen if those who have the control of it use the proper care, it furnishes evidence, in the absence of explanation by the defendant, that the accident arose from want of care. *Ellis v. R. R.,* 24 N. C., 138; *Aycock v. R. R.,* 89 N. C., 321; *Stewart v. Carpet Co.,* 138 N. C., 60, and *Womble v. Grocery Co.,* 135 N. C., 474 (elevator cases); *Ross v. Cotton Mill,* 140 N. C., 115, and *Morrisett v. Mills,* 151 N. C., 31 (sudden and unexpected starting of machines); *Haynes v. Gas Co.,* 114 N. C., 203, and *Turner v. Power Co.,* 154 N. C., 131 (loose or unguarded wires charged with electricity); *Fitzgerald v. R. R.,* 141 N. C., 530 (where a piece of coal fell from the tender); *Knott v. R. R.,* 142 N. C., 242 (where sparks flew from the engine, as in the *Aycock case*); and numerous other like cases which the present *Chief Justice* has collected in a note to the *Aycock case,* 89 N. C. (Anno. Ed.), at marg. p. 331.

The doctrine and its limitations are well settled by our own decisions, and they have been recently approved by the highest of the Federal courts in *Sweeney v. Erving,* 228 U. S., 233, where the Court substantially states the rule as follows:

"In our opinion, *res ipsa loquitur* means that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that they furnish circumstantial evidence of negligence where

direct evidence of it may be lacking; but it is evidence to be weighed, not necessarily to be accepted as sufficient; that they call for explanation or rebuttal, not necessarily that they require it; that they may make a case to be decided by the jury, not that they forestall the verdict. *Res ipsa loquitur,* where it applies, does not convert the defendant's general issue into an affirmative defense. When all the evidence is in, the question for the jury is, whether the preponderance is with the plaintiff. Such, we think, is the view generally taken of the matter in well considered judicial opinions"; and the Court, after citing many authorities, then quotes this passage from *Stewart v. Carpet Co., supra:* "The rule of *res ipsa loquitur* does not relieve the plaintiff of the burden of showing negligence, nor does it raise any presumption in his favor. Whether the defendant introduces evidence or not, the plaintiff in this case will not be entitled to a verdict unless he satisfies the jury by the preponderance of the evidence that his injuries were caused by a defect in the elevator, attributable to the defendant's negligence. The law attaches no special weight, as proof, to the fact of an accident, but simply holds it to be sufficient for the consideration of the jury, even in the absence of any additional evidence."

There is a most exhaustive and valuable note upon this question to be found at the foot of *Cincinnati Traction Co. v. Holzenkamp,* 113 Am. St. Rep., at p. 980 *et seq.*

In Whitaker's Smith on Negligence, at p. 422, which is quoted with approval in the *Haynes case,* at p. 208, it is said: "If the accident is connected with the defendant, the question whether the phrase, '*res ipsa loquitur,*' applies or not becomes a simple one of common sense." Ray on Neglect of Imposed Duties, 423; Wood on Railroad Law, 1079.

Now, let us apply the principle, as thus recognized by the courts, to the facts of this case. The car in question was certainly under the management of defendant. As was said of the coal dropping in *Fitzgerald's case,* so it may be said in this case, that the top of a box car, properly constructed, does not blow off "in the ordinary course of things," when the velocity of the wind is not so great that a conductor and a brakeman can walk across without serious difficulty. In *Freeland v. R. R.,* 146 N. C., 266, it was held to be negligence for a railroad company not to provide a walkway on top of a box car. Does a railroad company fulfill this legal duty by furnishing a walkway so rotten or otherwise defective that a slight wind will blow it off? Assuredly not. The doctrine of *res ipsa loquitur* is, to some extent, founded upon the fact that the chief evidence as to the true cause of the injury, whether culpable or innocent, is practically accessible to the party charged and perhaps inaccessible to the party injured. Can a case be supposed in which the evidence of the "true cause" of the injury would be more exclusively within the knowl-

edge of the defendant than in this one? The doctrine is not confined to injuries caused by the failure of mechanical appliances or machines, as is decided in *Fitzgerald's case, supra,* and several of the cases heretofore cited are authority for the proposition that the doctrine applies to a servant's action against his master for negligent injury.

Some text-writers state that the Supreme Court of the United States does not recognize this doctrine in actions between master and servant, and the case of *Patton v. T. P. and R. Co.,* 179 U. S., 658, is cited as authority for this contention. The reference in the opinion to this doctrine is *obiter,* as will be seen by a careful consideration of the facts in that case. But even if the Court did so hold in that case, the reason for depriving a plaintiff of the benefit of the doctrine, when the plaintiff happens to be a servant of the defendant, no longer exists. Those cases which deny the applicability of the doctrine in an action by a servant against his master proceed upon the theory that the injury may be referred to the negligence of a fellow-servant, or to contributory negligence of the plaintiff, with just as much reason as to the negligence of the master. Under the employers' liability act the defense of the fellow-servant doctrine is excluded, as is that of contributory negligence to some extent; hence the reason for the law, as thus stated, having ceased, the rule ceases.

In the recent case of *Sweeney v. Erving,* 228 U. S., 233, already cited by us, the doctrine of *res ipsa loquitur* is recognized by the Supreme Court of the United States in an action for damages for personal injuries brought by a patient against a physician in the use of the X-ray, and the question of contributory negligence might become involved in such a case.

The fact that the plaintiff was along for the purpose of learning the road would place upon the defendant the duty of observing a higher degree of care with regard to plaintiff than with respect to a regular servant. He had no duties to perform on this return trip that would in any wise acquaint him with the condition of the cars, because he had none to perform at all, except when ordered to perform some specific duty by the conductor, as he was "subject to the orders of the conductor." Every argument that can be advanced for applying the doctrine, when plaintiff is a passenger, applies with equal force for the recognition of the doctrine in this case.

But in this case it is not necessary for plaintiff to invoke the aid of this doctrine. There is ample proof of positive negligence from both plaintiff's and defendant's witnesses. The motion to nonsuit was made at the close of all the evidence; hence all the evidence will be construed in the light most favorable to plaintiff. *Parlier v. R. R.,* 129 N. C., 262. We cannot decide upon the nonsuit by selecting portions of the evidence

which appear to favor the defendant. *Poe v. Tel. Co.,* 160 N. C., 315; *Dail v. Taylor,* 151 N. C., 289; *Hamilton v. Lumber Co.,* 156 N. C., 523.

Plaintiff testifies that before he was thrown off he observed the planks of the roof "jumping up and down." This proves that the planks were not nailed to the rafters as clearly as if he had sworn directly to that fact. If they were not nailed, this fact would have been readily disclosed by inspection. If this were all the evidence, the plaintiff, it would appear, has established negligence by direct and positive proof; but the evidence is still stronger. It had been ten days since this car had been inspected. Defendants do not explain where the car was; they merely show its arrival in Raleigh on 10 October, loaded with hay for Fayetteville, and its inspection, and that is all. Is it not a question for the jury to say whether or not the car should have been inspected within less than ten days before its departure for Fayetteville? Again, the defendant had a car inspector at Fayetteville, named Cameron, and the car was carried on to Fayetteville after the injury. Cameron was not introduced as a witness. He could have described the condition of the car after the injury and thus have aided the jury in fixing the cause of the injury, as defendant attempted to do by others. The jury was justified in drawing inferences unfavorable to defendant from its failure to use him as a witness. This car was P. and R., No. 2930. P. and R. means Philadelphia and Reading—one of the oldest railroads in the country—and the low number, 2930, may indicate that it was an old car. Conductor Jones says that it was not new. The defendant was under a duty to inspect this car with reasonable care and such frequency, owing to its age, as to keep posted regarding its condition. The testimony of Jones is inconsistent with defendant's theory that the injury was due to a wind of extraordinary violence. He testified that there were fifteen cars in the train; that the top of the one in question was the only one to blow off; that underneath the pine plank forming the roof there was a tin lining which did not project out even with the eaves, but was folded back so that the wind could not get under it; yet this tin lining was blown off, showing that it was not fastened, because the most violent wind could hardly have moved the tin lining if properly fastened.

There is another aspect of the case which justified its submission to the jury. Defendant's pleadings and proof were both to the effect that plaintiff was along on the freight run for the purpose merely of learning the road. Plaintiff alleges that defendant was negligent, *inter alia,* in that it "allowed and ordered plaintiff to walk over the top of said car while in motion." If plaintiff was along for the sole purpose of learning the road, it was grossly negligent in the conductor to order him to walk over the car at a time when the conductor himself testifies it was dangerous to do so. The conductor was only a few feet in front of the

plaintiff, and it would have been a reasonable inference by the jury that he observed the plank of the roof "jumping up and down," yet he did not warn plaintiff. Defendant is not bound by his statement that he did not, as he had the opportunity of doing so. He testified that the wind was so violent that he had to hold to the running-board to prevent being blown off; yet he orders plaintiff, an inexperienced youth, who was there to learn the road, to cross over under these circumstances. Plaintiff testifies that he was expressly ordered by the conductor to go across the top of the car.

It was the plain duty of the defendant to have made a reasonable inspection of this car, even though it was a foreign car or one belonging to another road. Any other rule would expose its employees to great hazards. We have held that the failure to properly inspect such a car is negligence, and if damage ensue therefrom, it is culpable or actionable negligence (*Leak v. R. R.,* 124 N. C., 455); and the same principle was recognized and applied in *B. and O. R. R. v. Mackey,* 157 U. S., 72. The inspection must not only be made, but it must be done with due care. *Leak v. R. R., supra; Sheedy v. C. M. and St. Paul R. R.,* 55 Minn., 357.

There were facts in evidence from which the jury might reasonably have found that either no inspection had been made, or, if made, that it was carelessly done, and the defective condition of this car was, therefore, overlooked. The car in question was received by defendant at Raleigh on 10 October; it remained in its charge until the day of the injury, 20 October. Why it held this loaded car on its yard for ten days is unexplained; but, at all events, defendant had abundant opportunity for inspection. Defendant kept an inspector at Raleigh. The roof of this car is seen "jumping up and down," *i. e.,* loose, unnailed, only 16 miles from Raleigh, less than an hour's run. Is the conclusion not reasonable that the roof was in this condition when it left Raleigh? Nothing had happened, so far as the evidence discloses, between Raleigh and the place of injury, that should have caused the roof to get into this condition. A roof would not become defective in this way instantaneously from ordinary wear and tear. This case is not like the one of a latent defect in a car wheel or an iron brake, or an undiscoverable flaw in material, on account of which the defendant might be held blameless.

In *Mich. Central Ry. v. Townsend,* 114 Fed., 741, a brakeman fell from the top of a box car by reason of a defective running-board. The Court held that the jury was warranted in inferring that the master knew of the defect (a loose brace), from the fact that it was seen hanging loose after the injury. The facts of the case at bar create a much stronger presumption of the master's knowledge, as will be seen by a comparison of the two cases, because the defective roof was seen by plaintiff and could have been seen by defendant before the accident.

There are only two possible explanations for this injury, towit: (1) That the roof was defective, causing it, under the impact of an ordinary wind, to be thrown against plaintiff, thereby knocking him off the car, or (2) that the roof was not defective, and that a whirlwind of extraordinary violence blew the top off the car and carried plaintiff along with it. The plaintiff was entitled to recover in either event. If the roof was defective, it was a defect that should and would have been discovered by inspection before the car left Raleigh, as heretofore explained. If the roof was not defective, then the proximate cause of the injury was the violent wind, and the conductor having ordered plaintiff to cross over the car at a time when a wind of this violence was blowing, was guilty of negligence, or, to speak more accurately, the jury might have so found. If this explanation be accepted as correct, it cannot be said that this injury was due to the act of God, or to the *vis major,* which defendant could not successfully resist or overcome, because the wind did not arise after they had started across the car, but was blowing before they started, with equal violence. So we have, according to this view of the case, an order given plaintiff by one whom he was bound to obey, that he should expose himself to the peril of this violent whirlwind, and as a proximate result of his obedience of this order it blows both the car top and the plaintiff off the car. It was actionable negligence to give such an order under these circumstances. *Shadd v. R. R.,* 116 N. C., 968. Did the conductor give the order? Ridge's testimony is capable of no other construction. Conductor Jones states that he saw Ridge coming on behind him. Brown repeats the order in the presence of the conductor.

As to the general doctrine of *res ipsa loquitur,* in its application between master and servant, the following cases may profitably be consulted: *Parussi v. Railway,* 155 Fed. Rep., 654 (affirmed in 161 Fed. Rep., 66); *Byers v. Carnegie Steel Co.,* 159 Fed. Rep., 347.

The fact that the accident is of such a kind that it does not ordinarily occur if proper care is used, raises a *prima facie* case of negligence, nothing else appearing, and we can see no valid reason why it should not apply to master and servant, as to other relations. If there are special circumstances that take the case out of the operation of the rule, they are easily susceptible of proof by the defendant, who is in control of the situation. But we are proceeding under the Federal employers' liability act, which has abolished the defense of "fellow-servant," as our statute has done (Revisal, sec. 2646, and Laws of 1913, ch. 6), and also the defense of contributory negligence, which now goes to the proportionate diminution of the damages, if it is present in the particular case. At any rate, and however the law may be with respect to other circumstances of a kind differing from those appearing in this record,

we hold it applies here, and that, in addition, there is ample evidence of culpable negligence, apart from the applicability of that doctrine.

When a string of fifteen cars pass through a windstorm and only one of them is unroofed, it naturally leads us to inquire, What was the cause for this exception? And, too, we naturally answer: Well, there must have been something wrong with that particular car; its roof was weak or poorly fastened or braced to its sides, or there was some other defect in the roof, which caused it to give way to the force and pressure of the wind and fall to the ground, taking the plaintiff with it. There was a like query in *Haynes v. Gas. Co., supra,* and a similar answer, holding the company liable for the death of the child from handling a loose wire, highly charged with electricity, and dangling from one of its poles in the street.

This case, in principle, is not unlike that of *Means v. R. R.,* 124 N. C., 574. The negligence alleged there was that the train had several box cars, and one or two flat cars which were next to the engine, and a coach or caboose. The train had no conductor, but the engineer served in the double capacity of conductor and engineer, and in order to discharge his duties as such, he was accustomed to order the intestate, one of the train hands, to collect the tickets in the coach or caboose from the passengers and bring them to him, over the moving train. While doing so on one occasion, intestate fell from a flat car—how or why did not clearly appear—and was killed. The Court held that the defendant should not have required such perilous service to be performed by the intestate, for the sake of economy in operating its train, but that it should have had a conductor, and whether its failure to have one was the proximate cause of the death was a question for the jury. The only difference between that case and this is not unfavorable to the plaintiff. There the failure to have a conductor was the negligent act, and here the failure to have a car with a sound or proper roof is the negligence charged; but this dissimilarity of quality in the particular negligence charged against defendant should not be allowed to differentiate the two cases in principle. But this case is stronger for the plaintiff upon its facts than was that case for the plaintiff there. Here the plaintiff was required to do a dangerous service by walking over a moving train, as in *Means' case,* but the peril was greatly increased by the defective condition of the foreign car, over which he had to pass, and the then known fact that a high wind was prevailing, which even with a perfect car, as the conductor said, made it risky to venture thereon during the prevalence of the wind. He had to catch hold of the running-board to steady and save himself. In any view we can take of the case upon the conceded facts, the negligence of defendant is unquestionable.

Where there are two causes coöperating to produce an injury, one of which is attributable to defendant's negligence, the latter becomes liable, if together they are the proximate cause of the injury, or if defendant's negligence is such proximate cause. We discussed this question fully and exhaustively in the recent case (at this term) of *Steele v. Grant,* 166 N. C., 635. Where the master's negligence contributes to the result, although there may be a coöperating cause not due to the servant's act, the law will not undertake to apportion the liability, but will hold him responsible to the servant in the same degree and with the same consequences as if his negligence had been the sole cause of the injury. *Steele v. Grant, supra; Wade v. Contracting Co.,* 149 N. C., 177. As said in the oft-cited case of *Kellogg v. R. R.,* 94 U. S., 469, 475, "The inquiry must, therefore, always be whether there was any intermediate cause *disconnected from* the primary fault, and *self-operating,* which produced the injury." In this case there was no intermediate, or intervening, independent and efficient cause, which, operating alone, was sufficient of itself to break the connection between defendant's negligence and the injury, and the primary wrong must be considered as reaching from the beginning to the effect, and, therefore, as proximate to it. *Hardy v. Lumber Co.,* 160 N. C., at pp. 124, 125; *Kellogg v. R. R., supra; Ins. Co. v. Boon,* 95 U. S., 619. The windstorm would not, of itself, have caused the injury, as the testimony shows, when viewed favorably for the plaintiff; but it required the concurrence and coöperation of the defendant's negligence in having a defective car to produce the disastrous result. Judge Cooley thus states the rule, which applies to our facts: "If the original act was wrongful, and would naturally, according to the ordinary course of events, prove injurious to some other person or persons, and does actually result in injury through the intervention of other causes which are not wrongful, the injury shall be referred to the wrongful cause, passing by those which were innocent. But if the original wrong only becomes injurious in consequence of the intervention of some distinct wrongful act or omission by another, the injury shall be imputed to the last wrong as the proximate cause, and not to that which was more remote." Cooley on Torts (Ed. of 1879), p. 69. And this seems to accord with the *Kellogg case, supra.*

But we will consider this question further with reference to the duty of defendant to its employee. The rule deducible from the authorities is that the measure of care against accident which one must take to avoid responsibility is that which a person of ordinary prudence and caution would use if his own interests were to be affected and the whole risk were his own. *The Nitro-glycerine case,* 16 Wall. (U. S.), 524 (21 L. Ed., 206). And ordinary diligence or care is such as a man of ordinary prudence and intelligence will generally use under like circumstances, the

standard of comparison being the ordinary man. *C. I. Co. v. Stead,* 95 U. S., 161; *Texas, etc., R. Co. v. Behmyer,* 189 U. S., 468; *Union Ins. Co. v. Smith,* 124 U. S., 405. It is now generally conceded that there is no classification of negligence with respect to the degree of care required in any given case, as being slight, ordinary, and gross, as such a distinction can serve no practical purpose and is often very misleading. *Steamboat New World v. King,* 16 How. (U. S.), 469, 475; *Milwaukee, etc., R. Co. v. Arms,* 91 U. S., 489; 8 Enc. of U. S. S. C. Reports, pp. 878, 879, and notes. The requisite degree of care to be employed is that which is suited to the particular transaction being investigated, and reasonably commensurate with its circumstances and surroundings, ·that being supposed to be the care which any man of ordinary prudence will use, as dictated to him by a natural sense of his own protection and safety, if his personal rights were involved. Under this principle it was a duty owing to the plaintiff by the defendant that the latter furnish him with a reasonably safe working place, which in this case would be a car with a roof so constructed and kept in order or in reasonably safe and good condition for him to perform his duties with safety—not that defendant was required to insure or guarantee his safety, but to exercise due care in seeing that he is not unnecessarily imperiled or subjected to unusual dangers. *Marks v. Cotton Mills,* 135 N. C., 287. There was evidence that the defendant did not perform this duty, and the next question is, Was it the proximate cause of the injuries received by the plaintiff? On this question the language of *Justice Miller* in *Ins. Co. v. Tweed,* 74 U. S. (7 Wall.), at p. 52, is directly pertinent: "That the explosion was in some sense the cause of the fire is not denied, but it is claimed that its relation was too remote to bring the case within the exception of the policy. And we have had cited to us a general review of the doctrine of proximate and remote causes as it has arisen and been decided in the courts in a great variety of cases. It would be an unprofitable labor to enter into an examination of these cases. If we could deduce from them the best possible expression of the rule, it would remain after all to decide each case largely upon the special facts belonging to it, and often upon the very nicest discriminations. One of the most valuable of the criteria furnished us by these authorities is to ascertain whether any new cause has intervened between the fact accomplished and the alleged cause. If a new force or power has intervened, of itself sufficient to stand as the cause of the misfortune, the other must be considered as too remote. In the present case we think there is no such new cause. The explosion undoubtedly produced or set in operation the fire which burned the plaintiff's cotton. The fact that it was carried to the cotton by first burning another building supplies no new force or power which caused the burning. Nor can the accidental circumstance

that the wind was blowing in a direction to favor the progress of the fire towards the warehouse be considered a new cause." See, also, *Ins. Co. v. Boon,* 95 U. S., 117, and *Brady v. Ins. Co.,* 11 Mich., 42, where proximate cause is defined to be, "That which is the actual cause of the loss, whether operating directly or by putting intervening agencies, the operation of which could not be reasonably avoided, in motion, by which the loss is produced, is the cause to which such loss should be attributed." The case of *Milwaukee, etc., R. Co. v. Kellogg,* 94 U. S., 469 (24 L. Ed., 256, is also directly applicable, as in that case it appeared that the fire had been carried by a wind from the point of its origin to the property which was destroyed, and it was held to be proper that the question should be submitted to the jury to determine if the first act of negligence causing the fire was not the proximate cause of the destruction of the property which was burned. The jury so found, and the judgment upon the verdict was affirmed. The same Court held, in *G. T. R. Co. v. Cummings,* 106 U. S., 700 (27 L. Ed., 266), that "If the negligence of the railroad company (towards its employee, who was injured while performing his regular duties) contributed to, that is to say, had a share in producing the injury, the company was liable therefor," even though another cause intervened which united with such negligence in causing the injury, for which cause the company was not responsible. *Chief Justice Waite* said further: "If the negligence of the company contributed to it, it must necessarily have been an immediate cause of the accident, and it is no defense that another was likewise guilty of wrong." We have referred liberally to the decisions of that honorable Court because this is a case arising under a Federal statute, relating to the liability of employers engaged in interstate commerce. But the same views will be found expressed in our own books and those of our neighbors in the other States, and they seem to be practically of universal acceptance.

The recent decision in *Ferebee v. R. R.,* 163 N. C., 351, at p. 354, seems to cover this case completely. *Justice Hoke* there says: "It was urged for defendant that the evidence tending to show the prevalence of an unusual windstorm on the night in question has not been allowed its proper weight; but, on the facts in evidence, the position cannot avail the defendant. The negligent placing of the boxes having been accepted as the proximate cause of the injury, or one of them, the defendant is not relieved, though an unexpected or unusual storm should have contributed also to the result. . . . 'Inevitable accident is a broader term than an act of God. That implies the intervention of some cause not of human origin and not controllable by human power. An accident is inevitable if the person by whom it occurs neither has nor is legally bound to have sufficient power to avoid it or prevent its injuring another.

RIDGE *v.* R. R.

In such a case the essential element of a legal duty is wanting, and it cannot, therefore, be a case of negligence.' . . . 'When an act of God or an accident combines or concurs with the negligence of the defendant to produce the injury, or when any other efficient cause so combines or concurs, the defendant is liable if the injury would not have resulted but for his own negligent act or omission' "; citing and quoting from Sh. and Redf. on Negligence (6 Ed.), sec. 16.

There are some questions of evidence in the appeal. The opinion of the expert, Dr. Hunter, was not subject to the ground of objection stated by defendant's counsel. It is restricted in this Court to the reason given below for its objection (*Presnell v. Garrison,* 122 N. C., 595), which was that there was no evidence that plaintiff's vertebra was crushed. But Dr. Heartt testified that it was, and this was the statement of a fact and not merely the expression of an opinion. It was competent for the doctors to state what effect, if any, in their opinion, the broken vertebra would have upon their patient's physical and mental condition, as we think. *Summerlin v. R. R.,* 133 N. C., 551; *Alley v. Pipe Co.,* 159 N. C., 327, and especially *Mule Co. v. R. R.,* 160 N. C., 252. The defendant's own witness, Dr. Burrus, substantially testified to the same thing. *Albert v. Ins. Co.,* 122 N. C., 92. As to defendant's second assignment of error, it was competent, on the question of damages, for the plaintiff to testify as to his trade or business and his proficiency therein, and how the injury had reduced his earning capacity. *Rushing v. R. R.,* 149 N. C., 158.

We have been greatly aided in this case by the able arguments and briefs of counsel on both sides. Mr. Kelly has satisfied us, by his clear statement of the facts and the law and the citation of authorities, backed by his strong and lucid oral argument, that the views we have expressed are the correct ones and applicable to this case.

Upon a careful review of the whole case, we have concluded that there was no error committed at the trial of the cause. The rulings of the court upon evidence and the motion to nonsuit were correct, and the principles of law applicable to the facts were stated and explained to the jury by the court, in its charge, with great clearness and precision.

No error.